FEE PAID

FILED
CLERK, U.S. DISTRICT COURT
JULY 27 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

1  Anoush Hakimi (SBN 228858)
2  anoush@handslawgroup.com
   Peter Shahriari (SBN 237074)
3  peter@handslawgroup.com
4  **THE LAW OFFICE OF HAKIMI & SHAHRIARI**
   1800 Vine Street
5  Los Angeles, CA 90028
6  Telephone: (888) 635-2250
   Facsimile: (213) 402-2170
7
8  Attorneys for Plaintiff-Relator,
   **RELATOR, LLC**
9

10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT OF CALIFORNIA**

12                                          **2:22-CV-05198-CAS-JCx**
   **UNITED STATES OF AMERICA,**           Case No.
13
14        Plaintiff,
15  *ex rel.* **RELATOR LLC**, a California   **COMPLAINT FOR VIOLATIONS**
   limited liability company,              **OF FEDERAL FALSE CLAIMS**
16                                          **ACT**
17        Relator,
18     v.                                   **FILED *IN CAMERA* UNDER SEAL**
                                            **PURSUANT TO 31 U.S.C. §**
19  **ALIM KASAM,** an individual, **BRIAN**   **3730(b)(2)**
20  **O'SHAUGHNESSY,** an individual,
   **KEVIN O'SHAUGHNESSY,** an            **DO NOT PLACE ON PACER**
21  individual, **ATHAS CAPITAL**
   **GROUP, INC.**, a California Corporation;   **JURY TRIAL DEMANDED**
22  and DOES 1-10,
23        Defendants.
24
25
26
27        Plaintiff RELATOR LLC (hereinafter referred to as "Plaintiff") complains of
28

                              COMPLAINT

**ALIM KASAM,** an individual, **BRIAN O'SHAUGHNESSY,** an individual,

**KEVIN O'SHAUGHNESSY,** an individual, **ATHAS CAPITAL GROUP, INC.,**

a California Corporation; and DOES 1-10:

## I.     INTRODUCTION AND SUMMARY

1.      In this matter three mortgage lenders used their business which was

obviously <u>prohibited</u> from taking PPP (Paycheck Protection Program) ("PPP")

loans to embezzle millions of dollars in relief money. They presented a parade of

falsified loan documents to the SBA and received millions of dollars in a

profiteering scheme, while depriving other eligible businesses and workers of

desperately needed financial aid. Defendant's lending business was booming in

2020, and is still booming. They did not need the loan, so instead they used the

money on unauthorized purchases like luxury real estate. These Defendants further

deceived the government by falsifying additional documents to obtain a second

draw loan from the program. Astonishingly, they then falsified forgiveness

documents which were presented to the government to obtain loan forgiveness,

billing millions of dollars to the US taxpayer and while draining the program of aid

funds. In the months that followed the loans, the Defendants purchased luxury real

estate properties to add their collection in New York, Florida and California, using

the PPP money. Now that program is running dry.

2.      Athas Capital Group, Inc. (*hereinafter* "ATHAS") applied for and

COMPLAINT

received two PPP loans through two different banks for **$5,465,900.00**, purportedly to cover payroll costs and rent, however ATHAS falsified many documents in order to get these loans. ATHAS and its individual Defendant owners:

    a.  Falsified the true number of jobs on payroll;

    b.  Falsified loan eligibility;

    c.  Falsified allowable payroll costs;

    d.  Falsified the affiliation with its sister company in the same office;

    e.  Falsified the use of the loans on authorized expenses;

    f.  Falsified the economic need for the loans;

    g.  Falsified revenue reduction required for a second draw loan; and

    h.  Falsified the need for loan forgiveness

    3.    Many Americans lost their jobs during the pandemic and many small businesses closed, because the PPP money ran out. Many people are still losing their jobs. All the while, this company and its three owners bilked the PPP for millions of dollars in aid funds. They were <u>not</u> allowed to take this money. They did not need it. They did not return it. They used the money on unauthorized expenses. Then they embezzled even more when they took out a second draw loan. As a curtain act of corporate greed and misappropriation, they obtained loan forgiveness, foisting millions of dollars of their business expenses onto the taxpayers.

COMPLAINT

4.    <u>Obvious Restrictions Regarding Money Lenders</u>. ATHAS applied for and received two PPP loans for **$5,465,900.00**, purportedly to cover payroll costs and office rent, however these loans were not authorized because ATHAS is a <u>money lending</u> business and therefore *ineligible* to receive PPP loans. The restrictions were obvious. After receiving the loans ATHAS did not return the money, but rather obtained loan forgiveness, doubling down on the embezzlement, foisting the cost onto the American taxpayers. Although the vast majority of American industries are allowed to take PPP loans, a very few select industries are not allowed, such as money lenders. The rationale for this restriction is that money lenders have money on hand to cover their worker costs, and money lenders are not financially suffering as much as other business types.

5.    <u>Use of PPP Funds to Purchase Real Estate</u>.

In the months that followed the PPP loans, the Defendants purchased luxury real estate properties to add their collection in New York, Florida and California, using the PPP money. Among the unauthorized purchases made by Defendants are the purchase of the following real estate and the dates of purchase by Brian O'Shaughnessy:

1863 Murray Hill Rd., Boonville, NY 13309 (7/2021) market value $141,667

714 Surf View Dr., Santa Barbara, CA 93109 (1/2021) market value $591,040

8745 Pratt Dr., New Port Richey, FL 34654 (10/2020) market value $240,390

708 Enquirer Ave., Nashville, TN 37205 (2019) market value $2,948,200

Discovery will reveal exactly where the money was used, but ultimately it does not matter. Although the theft of public money is worse when used to buy real estate, any expenditure was prohibited. Any and all use of the money was unauthorized, because the loan was not permissible to begin with. It was NOT FOR THEM. It was all ill-gotten money. The buying of real estate made it worse. Funding a luxury spending spree with American tax dollars being squandered to subsidize the already opulent lifestyles of three unscrupulous businessmen, adds insult to injury. The American people have a right to be angry.

6.    No Economic Necessity and Mortgage-Backed-Securities (MBS). The rules explaining what the purpose of the loan are clear: to help struggling businesses pay their workers. There was no "need" or "economic necessity" to pay Defendant's payroll or rent expenses.[1] ATHAS cannot show any decline in revenue during the pandemic. In fact, during this time period mortgage lenders experienced record profits throughout their industry. This is not only because of the housing price increases and housing crisis, but also because of the Federal government's policy to purchase Mortgage-Backed-Securities (MBS) which provided mortgage

---

[1] They did not need the loans. They took advantage. ATHAS is not a small business in dire financial straits, but rather a well-financed finance company which was enjoying higher profits. Public information shows their revenue was not declining, and their own statements indicate massive growth and profits. Defendant cannot show "economic necessity" in needing the loans to continue business operations.

COMPLAINT

lenders like Defendant a steady source of high income.[2]  It is very unlikely

Defendant suffered any economic downturn. Quite the opposite: Defendants

enjoyed a <u>major increase</u> in revenue in 2020 and 2021. No loan was needed.

ATHAS had a very lucrative few years. There are many online statements by

ATHAS CEO Brian O'Shaughnessy and others at ATHAS describing, touting their

aggressive expansion in 2020 and 2021. ATHAS offices remained open and

business was actively continuing and increasing in volume and profitability. It was

a banner year for ATHAS and its owners. They had absolutely no need for a PPP

loan, let alone two loans, and for that much money. They took advantage of the PPP

program and used it as a windfall.

   7. <u>Co-Mingling and Inflated Payroll Count</u>. In reporting its loan needs,

ATHAS co-mingled its business expenses and operations with another company

which did not receive loan approval. ATHAS occupies the same exact office as

Rama Capital Partners, LLC ("RAMA"), 27001 Agoura Rd, Suite 200, Calabasas,

California 91301. RAMA is a hedge fund that is not eligible for a PPP loan either.

ATHAS and RAMA also share the same executives, owners, and co-founders, and

they advertise their affiliation with each other, on their website, but not on the PPP

applications. ATHAS *inflated* its reported jobs by also counting employees of

---

[2] Agency MBS purchases are issued by the Federal government. The US Federal Reserve has a $1.25 trillion program to purchase mortgages which was restarted on March 15. 2020 as a result of the COVID-19 crises. The result of this program is provide mortgage lenders with a guaranteed way to sell their mortgage assets. Mortgage lenders like Defendant enjoyed record profits during this time and benefited greatly from this program.

RAMA. They counted another company's employees to report a large number, for a larger loan.

8.    <u>Misappropriation to RAMA</u>. ATHAS misappropriated the loan funds by paying the payroll expenses of RAMA, a different company which did not receive loan approval. ATHAS violated the loan terms by spending the money on unauthorized expenses.

9.    <u>Unauthorized Expenses</u>. PPP funds must only be used on authorized expenses. PPP funds are:

NOT authorized for direct lenders,

NOT authorized for a business which has no economic need for the loan;

NOT authorized for a business to use the loan for expenses of different company;

NOT authorized for owner draws or distributions;

NOT authorized for payroll costs of in excess of $100,000; and

NOT authorized for businesses or individuals who fraudulently submit applications and supporting documents

10.    <u>Direct Lending</u>. ATHAS was <u>ineligible</u> to receive any SBA loans whatsoever. While almost every industry type is allowed to take PPP loans, a very few select number of industries are not permitted, including mortgage lenders like ATHAS. The rationale is that large cash rich money lenders which have the resources to pay their own payroll expenses should not take away money from small businesses which don't have ready access to liquid funds. Defendant's

business make it ineligible for SBA loans because they are **money lenders**.[3] Therefore, Defendant's certification was <u>false</u> because **they <u>are</u> the type of business/industry which is prohibited from SBA loans**. ATHAS is a direct lender that provides money loans to consumers, for mortgages. In an interview ATHAS' Chief Operational Officer and founder said, "The number one question I get asked by a new mortgage broker is, 'Are you a direct lender?' This is an intrinsically importance questions that is asked, and rightly so in this climate, and my answer is always yes."

11.    <u>NAICS Code 522292</u>. On its application, Defendant admits to its business function as a *lender* by reporting its industry type with the NAICS code 522292, which is for lending companies that use real estate as collateral. Despite all this, the company falsely reported to the SBA that it was permitted to take the loans even though SBA has clear rules prohibiting loans to lenders.

12.    <u>Inflated Number of Jobs Reported.</u> In its loan application ATHAS deceptively claimed to have 475 jobs. This number, 475, cannot be correct. It is a fabricated number which was provided by Defendants to obtain a larger sum loan. ATHAS does not have that much total square footage at its offices. Based on a standardized formula, an office of 5000 sq. ft. would only hold approximately 33 employees, for a high density office.[4] In order to house 475, over 100,000 square

---

[3] ATHAS is a direct lender. They specialize in home mortgage loans.
[4] High Density (80 – 150 square feet per employee): Majority open seating with rows of

footage of office space would be required. Even assuming operation in other states and out of office workers, 475 employees on regular payroll is an *inflated number* based on square footage reported and online sources regarding company size.

13.     <u>Defendants Obviously Knew Their Loan Applications Were Illegal</u>. Defendants falsified their eligible business expenses on their applications as well as the forgiveness application. ATHAS is a sophisticated company with extensive history in the lending industry. They knew full well lenders are not eligible to receive SBA 7(a) loans or PPP loans, nor were they eligible for loan forgiveness. Defendants intentionally ripped off a government aid program, needed by working families to survive.

14.     <u>Money Not Returned</u>. The loans were taken by a business which was not allowed to take even one penny in loans, let alone millions of dollars. The **$5,465,900.00** in funds should have been returned immediately. These loans should never have been sought in the first place.

15.     2nd <u>Draw PPP False Claims</u>. Defendants audaciously broke even more SBA rules when they sought out and obtained a second round PPP loan. The

---

small desks. May have a few private offices. Often seen in companies that house many different teams within the same space, as well as for sales, technology, coworking or customer support offices.
Average Density (150 – 250 square feet per employee): Mix of open cube or desk space and private offices. Traditional office layout.
Spacious (250 – 500 square feet per employee): Majority of the space consisting of large private offices. Historically seen in law firms. https://aquilacommercial.com/learning-center/how-much-office-space-need-calculator-per-person/#:~:text=To%20estimate%20how%20much%20space,x%20250%20sf%2Femploye ee).

Defendants were not eligible to receive the first draw, and the second draw PPP loan for additional reasons: ATHAS did not truly meet the 300 employee size limitation requirement. On their initial application ATHAS reported 475 employees. But on their second draw loan application they reported only 116 employees, *which means they purportedly kept only about 25% of their workforce*. This extreme change is false given the rapid growth of the number of home mortgages made between the first and second draws. This is another falsification, of many. This dramatically reduced number would make business operations as they knew it cease. Defendant must have kept most of their employees in reality, keeping more than 300 employees, because their business operation did not cease.[5] Defendant falsified its application when it claimed a loss of 25% revenue in 2020 as compared to 2019, which is required for the second draw loan. Defendant also falsified its application for the second draw loan when it attested that all of the 1st draw PPP loan proceeds were spent on authorized expenses only. Assuming company owners did not line their own pockets with the PPP loan, the initial loan was not permissible: not one dollar *could* have been spent on authorized purposes.

---

[5] ATHAS did not report, show, or evidence any reduction of revenue or economic need, which is a basic requirement for these loans, in addition to other types of eligibility requirements. There is no indication of layoffs. There is no indication of branch closures or office closures. There is no indication of any loss of business. In fact, it appears business grew. Notable loans are listed in detail on the company website and it appears there was no reduction in activity, making millions in loans as of very recent history. It is difficult to believe that Defendant's took the first PPP loan, purportedly spent millions on payroll costs, and yet most of their staff were not retained by the time they applied for the second loan. None of that makes sense. Defendant did not show any loss of profit or decline in business. It is widely known that the mortgage industry as a whole experienced record profits during the last two years. It is highly unlikely Defendant experienced a loss of revenue.

COMPLAINT

16.     Further Falsification on Loan Forgiveness. Defendant's falsified further documents in order to receive loan forgiveness, foisting the costs on the American taxpayer while depriving small businesses and their employees funding to stay open and working. Defendants had to attest as to the use of the funds and the amount used on authorized purposes. They lied on these documents and application also in order to receive partial forgiveness.

17.     Defendant's False Statements and Fraud. Defendants knowingly and intentionally made many material false statements to the government and bank to obtain the loans.

18.     Defendants did in fact receive the loans. *The Defendants have not returned the loan proceeds*.

19.     Defendant used the loan for unauthorized purposes.

20.     Defendant then sought and obtained partial loan forgiveness. They could not have complied with the requirements of forgiveness given their business type, assuming the executive and CEO did not simply pocket the money.

21.     Defendants' communication of false statements constitutes Wire Fraud pursuant to 18 U.S.C. Section 1343, which occurred when Defendants used "the wires" (this includes using the internet or the phone) to steal money by making false statements or promises.

22.     Defendant's communication of false statements also constitutes Bank

Fraud (18 U.S.C. Section 1344) – by making false statements to a bank or other financial institution.

23.     Defendants communicated in writing, deceptive statements, including without limitation, with respect to the eligibility of the company obtaining the loans, economic necessity of the loan, the intended purpose of the loan, and the actual use of the proceeds, among others.

24.     Plaintiff-Relator, Relator LLC on behalf of the United States of America brings this action to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law and equitable theories of unjust enrichment and payment by mistake.

25.     This action arises from numerous false statements and claims that the Defendant knowingly presented to the United States and the United States Small Business Administration ("SBA") and lenders acting on the SBA's behalf, in violation of the FCA and common law.

26.     The Defendants unlawfully obtained millions of dollars of PPP Proceeds (as defined below), and failed to return or repay the money. In fact, they went further and obtained total loan forgiveness. The US taxpayer unfairly subsidized their profitable business, while deserving small businesses found they could not longer get loans because of businesses like ATHAS which drained the

COMPLAINT

program.

27.     In summary, Defendants and their company ATHAS used the

pandemic to obtain millions of dollars from the government. They deceptively

completed the SBA loan applications by seeking money for a business which they

knew is INELIGIBLE to receive even 1 dollar of PPP loans, because it itself is a

lender. The industry in which ATHAS belongs is expressly *prohibited* from

receiving SBA loans generally and the PPP loan as well. ATHAS has loan

operations in almost every state in the country. They are a sprawling business with

reach from coast to coast. They have ample reservoirs of cash on hand, more than

enough to pay their workers. <u>Defendant's stock in trade is money</u>. Not only was the

loan impermissible, but they obtained forgiveness. The loans were only made

because the government and SBA relied on the many false statements made by

Defendants. ATHAS, its CEO and top executives knew full well that they were

making many false statements to the government and SBA. They knew full well

that their active pursuit in seeking out this money was illegal, but they persisted and

kept the money.

## II.     THE PARTIES

28.     Plaintiff-Relator LLC, is a California limited liability company with its

principal place of business in Los Angeles, California.

29.     Defendant Alim Kassam, is an individual and, at all relevant times

herein, is and was the Co-Chief Executive Officer and co-founder of Athas Capital

Group, Inc.

30.     Defendant Brian O'Shaughnessy, is an individual and, at all relevant times herein, is and was the Co-Chief Executive Officer and co-founder of Athas Capital Group, Inc.

31.     Defendant Kevin O'Shaughnessy, is an individual and, at all relevant times herein, is and was the Chief Operating Officer and co-founder of Athas Capital Group, Inc.

32.     Defendant Athas Capital Group, Inc. is a California Corporation formed on April 4, 2007, with its principal place of 27001 Agoura Rd, Suite 200, Calabasas, California 91301.

33.     ATHAS is a mortgage lender which directly provides home loans to people across the country.

34.     During round 1 of the paycheck protection program, Defendants applied for a PPP loan for **$3,465,900.00.** It was approved on April 8, 2020 by the SBA for the full amount, which was disbursed. The loan was facilitated by Western Alliance Bank. Defendant received 100% of the approved amount. On its application for this loan, Defendant stated that it had 475 employees for which it needed the loan.

35.     During round 2 of the paycheck protection program, Defendants applied for another PPP loan for **$2,000,000.00.** It was approved on February 9,

2020 by the SBA for the full amount, which was disbursed. This time Defendant's

switched banks, in an effort to hide their activities. There is no other reason they

would have used a different bank. The loan was facilitated by Community West

Bank, National Association. Defendant received 100% of the approved amount. On

its application for this loan, Defendant drastically changed the number of

employees reported. This time is stated that it had only 116 employees for which it

needed the loan, *a reduction of 76% of its employees*. This is very unlikely to be

true. This is another falsification, of many.

### III.    The CARES Act and Paycheck Protection Program

36.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic

Security Act ("the CARES Act" or "the Act") (Pub. L. 116-136) became law and

provided emergency assistance and health care response for individuals, families,

and businesses affected by the coronavirus pandemic. SBA received funding and

authority through the Act to modify existing loan programs and establish a new

loan program to assist small businesses nationwide adversely impacted by the

COVID-19 emergency.

37.    The CARES Act authorized loans to eligible small businesses

struggling to pay employees and other business expenses as a result of the

devastating effect of the COVID-19 pandemic.

38.    Section 1102 of the CARES Act temporarily permitted the SBA to

guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck

Protection Program" ("PPP").

39.    On April 24, 2020, the Paycheck Protection Program and Health Care

Enhancement Act (Pub. L. 116-139) became law and provided additional funding

and authority for the PPP. On June 5, 2020, the Paycheck Protection Program

Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116-142) became law and changed

key provisions of the Paycheck Protection Program, including provisions relating to

the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness

of PPP loans.

40.    Under the PPP, in 2020, eligible businesses could obtain one SBA

guaranteed PPP loan. Businesses were required to spend loan proceeds for

employee compensation, rent or mortgage, and other specified expenses and,

depending on their use of the loan proceeds, could qualify for loan forgiveness, up

to the full amount of the loan.

41.    The SBA delegated authority to third-party lenders to underwrite and

approve the PPP loans. In order to obtain a PPP loan, a qualifying business (through

its authorized representative) signed and submitted a PPP loan application (SBA

Form 2483) online through the lender's application platform. The PPP loan

application (SBA Form 2483) required the business (through its authorized

representative) to acknowledge the PPP program rules and make certain affirmative

certifications in order to be eligible to obtain the PPP loan.

COMPLAINT

42.    Once the Borrower submitted its PPP loan application (SBA Form 2483) to a Lender, the participating lender processed the PPP loan application. If a PPP loan application (SBA Form 2483) was approved by the participating lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

43.    After the Lender processed and approved a borrower's PPP loan application (Form 2483), but prior to the closing of the PPP loan, the Lender submitted to the SBA, the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA applying for a guarantee on the loan. For a PPP loan to be approved, the Lender was required to Answer Yes to the following questions in the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) as to the Borrower's certification of its General Eligibility to receive a PPP Loan:

| | | |
|---|---|---|
| • The Applicant has certified to the Lender that (1) it was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099MISC; (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant; (3) the funds will be used to retain workers and maintain payroll, or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, | ☐Yes | ☐No |

| | covered supplier costs, and covered worker protection expenditures; and (4) the Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)). | | |
|---|---|---|---|

SBA Form 2484 (emphasis added). Therefore, if a PPP borrower lied on its PPP loan application (SBA Form 2483), the PPP borrower's false certification caused the Lender to submit to the SBA with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484) that contained the PPP borrower's False Statement.

44.    SBA Form 2483 provides the following certification, among others  "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them" (hereafter the "Understanding Certification").

45.    SBA Form 2483 provides the following certification, among others "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)" (hereafter the "Eligibility

COMPLAINT

Certification").

46.     SBA Form 2483 provides the following certification, among others "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" (hereafter the "Use of Proceeds Certification")

47.     SBA Form 2483 additionally provides the following certification, among others: "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" (hereafter the "Economic Necessity Certification").

48.     SBA Form 2483 additionally provides the following certification, among others: "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud" (hereafter the "Worker Retention and Payroll Certification.")

49.     SBA Form 2483 additionally provides the following certification, among others: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (hereafter the "Single Loan Certification.")

50.    SBA Form 2483 additionally provides the following certification, among others: "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000" (hereafter the "No False Statements Certification").

51.    After the borrower submitted the PPP loan application, that application was then processed by a participating lender. If a PPP loan application was approved, the participating lender funded the loan using its own monies, which were then guaranteed by the SBA. Generally, in the event that the borrower defaulted on a PPP loan, the SBA would purchase the borrower's debt from the lending financial institution and take on the responsibility for paying back the loan.

52.    Under the applicable PPP rules and guidance, recipients of PPP loans could apply to have the interest and principal on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to

repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs (hereafter the "Loan Forgiveness Certification").

53.    Loans could only be used for certain permitted expenses, such as to fund payroll costs and employee benefits, such as health insurance, to pay for, mortgage interest, rent, utilities or worker protection costs related to COVID19.

54.    13 CFR§ 120.110 provides a list of what type of business are INELIGIBLE for SBA loans. This list includes <u>lenders</u> like Defendant …

**"(b) Financial businesses primarily engaged in the business of lending, such as banks, finance companies, and factors (pawn shops, although engaged in lending, may qualify in some circumstances)"**

55.    On April 2, 2020, the SBA posted the First PPP Interim Final Rule announcing the implementation of the CARES Act. SBA posted additional interim final rules on April 3, 2020, and April 14, 2020. On April 28, 2020, SBA posted an interim final rule supplementing the previously posted interim final rules with additional guidance. See, Federal Register / Vol. 85, No. 82 / Tuesday, April 28, 2020 / Rules and Regulations at, 23450-52, available at

https://home.treasury.gov/system/files/136/Interim-Final-Rule-on-Requirements-
for-Promissory-Notes-Authorizations-Affiliation-and-Eligibility.pdf. This interim

final rule supplemented previous regulations and guidance on several important,

discrete issues. The April 28, 2020, Interim Final Rule was immediately effective

without advance notice and public comment because section 1114 of the CARES

Act authorized SBA to issue regulations to implement Title I of the CARES Act

without regard to notice requirements. *Id.*

56.    With respect to the PPP, the January 6, 2021, Interim Final Rule

provided Clarification Regarding Eligible Businesses, specifically 13 CFR Parts 113,

120 and 121.

*"Are businesses that are generally ineligible for 7(a) loans under 13 CFR*

*120.110 eligible for a PPP loan?*

**Paragraphs (a), (g), and (k), of 13 C.F.R. 120.110 do not apply to PPP loans.**

**For PPP loans, the ineligibility restriction in 13 C.F.R. 120.110(n) is**

**superseded by subsection B.2.a.iii. of this interim final rule. Otherwise, a**

**business is not eligible for a PPP loan if it is a type of business concern (or**

**would be, if the entity were a business concern) described in 13 C.F.R.**

**120.110, except as permitted by subsections B.1.d and B.1.g of this rule or**

**otherwise permitted by PPP rules. Businesses that are not generally eligible**

**for a 7(a) loan under 13 C.F.R. 120.110 are described further in SBA's**

**Standard Operating Procedure (SOP) 50 10 6, Part 2, Section A, Chapter**

57.     The SBA's Standard Operating Procedure (SOP) 50 10 6, Part 2, Section A,

Chapter states as follows:

### CHAPTER 3: INELIGIBLE BUSINESSES

A. **TYPES OF INELIGIBLE BUSINESSES**

The SBA Lender must determine whether the Applicant is one of the types of businesses listed as ineligible in SBA regulations (13 CFR § 120.110). Certain business types appearing on this list may be eligible under limited circumstances, as discussed below.

1.  Businesses organized as non-profit businesses are ineligible (for-profit subsidiaries may be eligible). 13 CFR § 120.110 (a)

2.  Businesses Engaged in Lending 13 CFR § 120.110 (b).

    a.  SBA cannot guarantee a loan that provides funds to businesses primarily engaged in lending, investment, or to an otherwise eligible business engaged in financing, factoring, or investment not related or essential to the business. This prohibits SBA Loans to:

        i.   Banks;

        ii.  Life Insurance Companies (but not independent agents);

        iii. Finance Companies;

        iv.  Factoring Companies;

        v.   Investment Companies;

        vi.  Bail Bond Companies; and

        vii. Other businesses whose stock in trade is money.

    b.  The limited circumstances under which certain businesses engaged in lending may be eligible are as follows:

        i.   A pawn shop that provides financing is eligible if more than 50% of its revenue for the previous year was from the sale of merchandise rather than from interest on loans.

        ii.  A business that provides financing in the regular course of its business (such as a business that finances credit sales) is eligible, provided less than 50% of its revenue is from financing its sales.

        iii. A mortgage servicing company that disburses loans and sells them within 14 calendar days of loan closing is eligible. Mortgage companies primarily engaged in the business of servicing loans are eligible. Mortgage companies that make loans and hold them in their portfolio are not eligible.

        iv.  A check cashing business is eligible if it receives more than 50% of its revenue from the service of cashing checks.

Effective October 1, 2020                                                      Page 141

58.     ATHAS is a lender. They are expressly prohibited from receiving SBA

COMPLAINT

loans, including PPP loans. ATHAS's Co-CEOs, Alim Kasam and Brian

O'Shaughnessy, are sophisticated businessmen. They know this. The legal and

financial experts they have hired over the years, would have known this. They

broke these clear rules knowing full well what they were doing.

59.     Defendant's certification was false because **they are the type of business/industry which is prohibited from SBA loans**: **The Defendants are lenders**.

60.     In addition to applying any applicable business type ineligibility rules, all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483) stating that ''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''

61.     ATHAS is an obviously successful money lending business. It took advantage of every aspect of the PPP program, from getting multiple loans, maximizing the amounts of each loan and then loan forgiveness. The Co-CEO's are seasoned and cunning businessmen, well versed in the laws regulating the lending industry. Discovery will reveal where the millions in PPP funds were actually spent, but what is obvious is that ATHAS *did not need any money from US taxpayers*. This business was lending other people money. Public sources reveal that ATHAS is and was highly profitable, during the pandemic, just like most in

their industry. ATHAS did not suffer any business loss and certainly had the money to pay their own mortgage and worker wages. ATHAS**'s** "stock in trade" is money and business was booming. ATHAS simply ripped off the PPP program and had the US taxpayers subsidize their business, at best, subsidize their executive's luxury life styles, at worst.

62.        The Defendant's use of PPP on unauthorized expenses, like real estate, makes this embezzlement particularly nefarious. In the immediate months that followed the PPP loans, the Defendants purchased luxury real estate properties to add their collection in New York, Florida and California, using the PPP money. Discovery will reveal exactly where the money was used, but ultimately it does not matter. It certainly makes it worse if the Defendant purchased real estate and personal items, but any expenditure was not allowed. It was all illegal money. Buying real estate and funding a luxury spending spree to subsidize an already opulent lifestyle, adds insult to injury. The American people have a right to be angry.

## IV.    Defendants' False Statements and Misuse of Proceeds

63.        Defendants applied for and received the PPP Loans in the total amount of **$5,465,900.00**. In order to receive the loans, Defendants would have to have completed SBA Form 2483 entitled "Borrower Application Form". In doing so, Defendants intentionally made materially false statements with respect to the Eligibility Certification, the Use of Proceeds Certification, the Economic Necessity Certification, the Worker Retention and Payroll Certification, the No False

Statements Certification and the Single Loan Certification.

64.     Defendants signed the loan applications, thereby endorsing the Understanding Certification, which means that they agreed that they understood the rules and guidelines of the PPP, including, without limitation the rules regarding use of proceeds and the certifications made.

65.     The proceeds of the PPP Loan were not and could not have been used only for authorized purposes consistent with the Paycheck Protection Program Rule, because, among other things, the Defendant was obviously not allowed to take PPP loans because of their industry type - money lenders. Therefore when Defendants made the Use of Proceeds Certification, the certification was false.

66.     The proceeds of the PPP Loan were not necessary to support the ongoing operations of ATHAS. The company's website provides a list of many loans they had provided throughout the pandemic, up though today. The company also provides a map of the United States where they make loans. Almost every single state is colored in, showing their coverage. This is a growing national company. It is rich. It is cash rich. This company had considerable financial resources to pay its own business costs, assuming that is where the money was spent rather than into the pockets of its owners and his executives. Therefore, when Defendants made the Economic Necessity Certification, the certification was false.

67.     The PPP loan money was only allowed to be used on authorized

COMPLAINT

expenses. The proceeds of the PPP Loan were not permitted to be used to pay business costs for a business in the lending industry, therefore when Defendant made the Worker Retention and Payroll Certification, the certification was false.

68.    Defendants broke even more SBA rules when they sought out and obtained a second draw PPP loan. The Defendants were not eligible to receive the second round PPP loan because ATHAS did not truly meet the 300 employee size requirement. Defendant falsified its application when it claimed a loss of 25% revenue in 2020 as compared to 2019, which is required for the second draw loan. Defendant also falsified its application for the second draw loan when it attested that all of the 1st draw PPP loan proceeds were spent on authorized expenses only.

69.    The Defendants actively pursued and obtained loan forgiveness. As a mortgage lender, ATHAS is prohibited from obtaining any PPP loans, therefore any expenditures using PPP loan money was not authorized. In their forgiveness application, Defendant's falsely reported that they spent 100% of the loan proceeds on eligible expenses. Therefore, they lied on this application and certification statements to obtain this forgiveness.

70.    On their loan applications, Defendant intentionally made many key statements which were obviously false and intended to deceive. These key false statements by Defendant made it possible for them to get the loans and get them written off with forgiveness.

COMPLAINT

71.    By virtue of the above false statements, when Defendants made the No

False Statements Certification, that certification was false.

## V.    THE FALSE CLAIMS ACT

72.    Plaintiff alleges that, from at least April 28, 2020 through the time of

the filing of this Complaint, Defendants violated the FCA by "knowingly"

submitting and/or causing the submission of false claims for payment to lenders

authorized by the SBA to process PPP loan applications in the form of PPP

Applications and the resulting receipt and failure to return PPP loans. These claims

for payment were false because Defendants: (1) made knowingly false statements

and certifications in their PPP applications, and in certifications accompanying its

receipt of federal PPP funds, that it was complying with, and would continue to

comply with, applicable laws and regulations governing the award of PPP loans;

and/or (2) made, or caused to be made, false representations in loan applications

that the Defendants were eligible to receive such PPP loans. Moreover, Defendants'

false claims caused the bank that their used to facilitate the loan on numerous

occasions submit to the SBA, a Lender's Application - Paycheck Protection

Program Loan Guaranty (SBA Form 2484) that contained Defendants' false

statement concerning Defendants' general eligibility for the PPP loans, on which

the SBA relied and paid to the lenders. The bank relied on these false statements

and passed them along to the government.

73.    The False Claims Act prohibits fraudulent conduct in connection with

federal programs, including the knowing submission of false claims for payment to

the government. See 31 U.S.C. § 3729(a)(1)(A). In these circumstances, liability

may attach if the omission renders those representations misleading. 41. 31 U.S.C.

§ 3729(a)(1)(A) and (B) of the FCA provide that:

(1) . . . any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government . . .

31 U.S.C. § 3729(a)(1)(A), (B), and (G) (2020).

42. The scope of a false or fraudulent claim is to be broadly construed. As used in the FCA, a "claim"

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any

portion of the money or property which is requested or demanded; . . .

31 U.S.C. § 3729(b)(2) (2020).

74.    A person who violates the False Claims Act during the time period at issue "is liable for a civil penalty as adjusted, plus 3 times the amount of damages which the United States Government sustains because of the act of that person." 31 U.S.C. § 3729(a). See 28 C.F.R. § 85.3(a)(9); Department of Justice, 28 CFR Part 85, Civil Monetary Penalties Inflation Adjustments for 2022 published at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/pdf/2022-09928.pdf.

## VI.    JURISDICTION & VENUE

75.    This Court has subject matter jurisdiction over the Plaintiff's claims brought under the FCA, 31 U.S.C. §§ 3279, et seq., pursuant to 31 U.S.C. §§ 3730 and 3732. This Court has supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

76.    Plaintiff The United States of America is also located in the Central District of California. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at all times material hereto, Defendants transacted business and are located in the Central District of California, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.[6]

77.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Defendant's acts that form the basis of this Complaint occurred in the Central District of California.

---

[6]ATHAS operates in California and is headquartered in California, close to the Central District. ATHAS has formed an operating entity in California and transacts business in California.

78.     Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has been a public disclosure unknown to Relator, it is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

## VII.   FIRST CAUSE OF ACTION

### FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729.(a)(1)(A-B))

79.     Plaintiff alleges and incorporates by reference each and every allegation contained in all prior paragraphs of this complaint.

80.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended.

81.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States government, false or fraudulent claims for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(A).

82.     By virtue of the acts described above, Defendants knowingly made or

used, or caused to be made or used, false or fraudulent records or statements

material to false or fraudulent claims for payment by the Government.

83.    Because of the Defendants' acts, the United States sustained damages

in an amount to be determined at trial and, therefore, is entitled to treble damages

under the FCA, plus civil penalties of not less than $12,537.00 and not more than

$25,076.00 for each and every violation arising from Defendants' unlawful conduct

alleged herein.

## VIII. CONCLUSION

84.    The PPP is meant for small businesses, not million-dollar lenders with

large amounts of money already available to them. The PPP was meant to give

small businesses and working Americans a fighting chance, so they did not have to

go into debt. The PPP was not meant for a fast grift for well-heeled and cunning

businessmen to have the US taxpayers subsidize their business. The PPP program

was meant to let average Americans keep their jobs, not to let rich money lenders

line their pockets. The defendants defrauded the Federal government and US

taxpayers, misappropriating millions of dollars intended to help needful working

Americans at a time of crises. Now that program is dry.

//

//

//

COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against Defendants, as follows:

1.  That this Court enter judgment against each Defendant in an amount equal to three times the damages that the United States has sustained because of Defendants' action, plus a civil penalty of not less than $12,537.00 and not more than $25,076.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper.

2.  Such other relief as this Court may deem just and proper, together with interest and costs of this action.

3.  Reasonable attorney fees, litigation expenses, and costs of suit

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: July 15, 2022                     THE LAW OFFICE OF HAKIMI & SHAHRIARI


                                   By:    /s/ Peter Shahriari
                                          PETER SHAHRIARI, ESQ.
                                          Attorney for Plaintiff

COMPLAINT